UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARYISE L. EARL,

                    Plaintiff,

        v.                                    Case No. 20-cv-617-pp

STEVE R. KINZIGER, *et al.*,

                    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 97) AND DISMISSING CASE**

        Plaintiff Daryise L. Earl, who is incarcerated at the Kettle Moraine Correctional Institution and is representing himself, is proceeding under 42 U.S.C. §1983 on federal and state-law claims against dentists, dental hygienists and nurses at Kettle Moraine. The defendants have moved for summary judgment. Dkt. No. 97. The plaintiff has opposed the motion, dkt. no. 126, and the defendants have filed a reply brief, dkt. no. 127.[1] The court will grant the defendants' motion and dismiss the case.

---

[1] The plaintiff also filed a sur-reply, although he did not ask the court for leave to do so. Dkt. No. 128.

## I. Facts

### A. Procedural Background[2]

The court allowed the plaintiff to proceed on Eighth Amendment claims alleging deliberate indifference against defendants Steven Kinziger, Angelo Panos (also identified as Does #3 and #5), Kwon Yang (also identified as Does #6 through #8), Marissa Shier (originally identified as Doe Defendant #1), Lori Doehling and Julie Ludwig (both originally identified as Doe #4) and Wisconsin's Self-Funded Property & Liability Program (originally identified as Doe #9). Dkt. No. 11 at 12–19. The court also allowed the plaintiff to proceed on a state-law negligence claim against Yang (again, identified as Does #6 through #8). Id. at 19–20. On July 20, 2021, the court granted the plaintiff's motion to substitute the defendants' identities for the Doe placeholders used in his amended complaint. Dkt. No. 53 at 1–3.[3]

On May 25, 2022, the court granted the plaintiff's motion to substitute Jessica Bohn in place of Shier because the plaintiff had learned that Bohn was the true identify of Doe Defendant #1. Dkt. No. 83 at 4–5. The court dismissed Shier from the case. Id. On September 16, 2022, the court dismissed

---

[2] The court detailed the procedural history of the case in its February 14, 2022, order granting the Wisconsin Injured Patients and Families Compensation Fund's motion for summary judgment. Dkt. No. 81 at 2–4. The court will not recount that full history and will discuss only the procedural history that is relevant to this decision.

[3] The court did not permit the plaintiff to proceed against Doe #2, who he alleged was "the member of the prison medical staff who responded to the plaintiff's November 25, 2018 dental service request." Dkt. No. 11 at 14–15. But the defendants' evidence shows that Dr. Kinziger is the staff member who responded to that particular request. Dkt. No. 100-1 at 25.

Wisconsin's Self-Funded Property & Liability Program because the plaintiff had not properly identified that defendant. Dkt. No. 96. The court ordered that any party wishing to file dispositive motions must do so by November 18, 2022. Id. at 2.

At the November 18, 2022 deadline, the defendants filed their motion for summary judgment. Dkt. No. 97. The court ordered the plaintiff to respond to the motion by the end of the day on December 19, 2022. Dkt. No. 107. The court twice granted the plaintiff's requests for an extension of time to file his response. Dkt. Nos. 109, 112. The plaintiff then filed several motions asking the court to appoint a neutral expert, dkt. no. 111, to appoint counsel, dkt. no, 118, and for clarification of "whether or not res ipsa loquitur can substitute for expert testimony in this case," dkt. no. 121. On June 8, 2023, the court denied those motions and ordered the plaintiff to file his response to the defendants' motion for summary judgment by July 14, 2023. Dkt. No. 122.

On June 22, 2023, the court received from the plaintiff a letter suggesting that he might not be able to meet the July 14, 2023 deadline. Dkt. No. 124. But on July 10, 2023, the court received the plaintiff's response materials. Dkt. No. 125, 126. The defendants filed their reply brief on July 24, 2023, which completed briefing on the summary judgment motion. Dkt. No. 127. On August 4, 2023, the court received "Plaintiff's Reply Dkt. #127." Dkt. No. 128.

B.    Factual Background

    1.    *The Plaintiff's Response Materials*

The plaintiff did not file a declaration or any evidence in response to the defendants' summary judgment motion. Instead, he filed a document titled, "The Plaintiff's Dispute of the Defendants' Proposed Findings of Facts." Dkt. No. 125. This document is a sort of hybrid declaration and response to the defendants' proposed facts that, as the name suggests, "opposes all of the Defendants's [*sic*] alleged facts that attempt to discredit the claims [the plaintiff] has made within his amended complaint." Id. at 1. The document specifically disputes only some of the defendants' proposed findings of fact; in support of those disputes, the document cites paragraphs from the plaintiff's amended complaint (Dkt. No. 9) or other documents. The plaintiff signed this document and asserts, under penalty of perjury, that it "is an accurate account of these facts." Id. at 8 (citing 28 U.S.C. §1746).

Section 1746 of Title 28 of the United States Code provides a process for someone to "verify" a document by unsworn declaration; if a person follows this procedure and "verifies" the document, the document then has the effect of sworn evidence. Section 1746 says that to verify a document, the person must write, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)" at the end of the document.

Unlike the plaintiff's "Dispute of the Defendants' Proposed Findings of Facts," the plaintiff's amended complaint is not verified; it is only signed by the

plaintiff and notarized. Dkt. No. 9 at 13. When a complaint is verified, the court may treat it as "the equivalent of an affidavit" for purposes of summary judgment. Devbrow v. Gallegos, 735 F.3d 584, 587 (7th Cir. 2013). That is because when an incarcerated person verifies his complaint, he is swearing that the allegations stated in the complaint are true and that they may "serve as evidence for purposes of summary judgment." Jones v. Van Lanen, 27 F.4th 1280, 1285 (7th Cir. 2022) (citing Ford v. Wilson, 90 F.3d 245, 246–47 (7th Cir. 1996)). Because the plaintiff's amended complaint is not verified, it contains only allegations and *does not* contain "sworn statements of fact." Id. Those allegations are much the same as hearsay, which the court may not consider for purposes of summary judgment because they would not be admissible at trial. See Fed. R. Civ. P. 56(c)(4); Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment.").

Because the plaintiff's amended complaint is not verified, the court will not consider it as evidence for purposes of this decision. That means the court will not consider the plaintiff's citations to his amended complaint as evidentiary support for his factual disputes. Because the plaintiff's "Dispute of the Defendants' Proposed Findings of Facts" is verified, the court will treat the statements in that document as sworn statements of fact for purposes of this decision, provided they are based on the plaintiff's personal knowledge and otherwise comply with Federal Rule of Civil Procedure 56(c)(4) and Civil Local

Rule 56(b)(2) (E.D. Wis.). See Cambronero v. Meli, No. 22-2103, 2023 WL

4946724, at *2 (7th Cir. Aug. 3, 2023) (citing Simpson v. Franciscan All., Inc.,

827 F.3d 656, 662 (7th Cir. 2016)) ("[D]eclarations must be based on personal

knowledge, not unsupported conclusory assertions.").

### 2. *The Parties and Claims*

The plaintiff is incarcerated at Kettle Moraine and was housed there

during the events described in the complaint. Dkt. No. 99 at ¶1. The

defendants are state employees who worked at Kettle Moraine or other

Wisconsin Department of Corrections (DOC) institutions during the events

described in the complaint. Id. at ¶¶ 2–7. Kinziger, Panos and Yang are

dentists; Bohn is a dental assistant; Doehling is retired but was the Nursing

Coordinator at the DOC's Central Office; and Ludwig was the Health Services

Manager at Kettle Moraine from September 16, 2019 to December 5, 2021. Id.

The court allowed the plaintiff to proceed under the Eighth Amendment

on claims that: 1) in June 2018, Dr. Kinziger failed to provide prompt

treatment of an abscess in the plaintiff's tooth; 2) Bohn told the plaintiff that

he would be placed on the waitlist after his June 2018 appointment instead of

scheduling him for prompt treatment for his abscess; 3) Ludwig and Doehling

failed to ensure that the plaintiff received prompt treatment for his dental pain;

4) Dr. Panos failed to ensure the plaintiff received prompt treatment for his

abscessed tooth; and 5) Dr. Yang failed to provide prompt and proper treatment

for a tooth filling. Id. at ¶8 (citing Dkt. Nos. 11, 53 and 72). The court exercised

supplemental jurisdiction over a state-law negligence claim against Dr. Yang. Id.

### 3. *Dental Services at Kettle Moraine*

Persons newly incarcerated at Kettle Moraine receive an Inmate Handbook and form POC-74, which provides information about clinic hours and how to submit a Dental Service Request (DSR). Id. at ¶9; Dkt. Nos. 101-3, 101-4. The form concerning dental service lists "emergency dental needs" as those that involve severe dental pain that might interfere with a patient's sleep; a broken jaw; bleeding that does not stop, such as after a tooth extraction; and swelling in the jaw, gums or throat. Dkt. No. 101-3. Kettle Moraine Deputy Warden Secretary Jillion Schema (who is not a defendant) avers that examples of non-emergency dental issues are broken fillings, chipped or decayed teeth, bleeding gums and other chronic dental issues. Dkt. No. 101 at ¶7. The Inmate Handbook clarifies, "Toothaches are not considered an emergency." Dkt. No. 101-4 at 2. The plaintiff contests the defendants' list of emergency dental conditions and asserts that an "abscessed tooth falls into the class of significant dental conditions that require emergency medical treatment." Dkt. No. 125 at ¶2. He cites no evidence in support of that assertion, but he cites the Seventh Circuit's decision in Dobbey v. Mitchell-Lawshea, 806 F.3d 938, 940 (7th Cir 2015), which this court quoted at length in the screening order. Id.; Dkt. No. 11 at 12–13.

The Inmate Handbook advises incarcerated persons to fill out a DSR or otherwise request to be seen by the Dental Department for dental issues. Dkt. No. 101-4 at 2. Incarcerated persons often use interview/information requests to ask for dental treatment, and prison medical staff process those requests in

the same manner as DSRs. Dkt. No. 99 at ¶12. According to Bohn, incarcerated persons wanting to be placed on the waitlist for a dental appointment must submit a DSR or other written request for treatment. Dkt. No. 104 at ¶7. If a patient does not submit a written request, he will not be placed on the waitlist. Id.

Only dentists are qualified to triage DSRs; neither dental hygienists nor dental assistants may triage DSRs. Dkt. No. 99 at ¶14. A registered nurse may triage a DSR if the dental services unit is closed, but only if the request is for non-emergency care. Id. Dentists triage a DSR on the workday they receive it and organize DSRs by category: urgent, routine, hygiene, essential or prosthetic. Id. at ¶15. They record the description and provide a copy to the patient, and the original is scanned into the DOC's dental management software. Id. Dental assistants then schedule patients based on the dentist's triaging of the DSR. Id. at ¶16. The waitlist is established chronologically, based on receipt of the DSR. Id. The Health Services Manager may request a dental evaluation for a patient based on complaints he has filed, but they may not authorize or direct dental treatment for a patient. Id. at ¶83.

If a patient has an urgent need, dental staff will bring him for treatment as soon as possible. Id. at ¶17. Staff also may triage a patient and see him sooner if his condition changes. Id. at ¶18. Staff schedule urgent dental needs within twenty-four hours, or within seventy-two hours for facilities without full-time dentists, and treat issues the same day if it is clinically possible to do so. Id. at ¶19. Under Wisconsin Department of Adult Institution policy, the goal for

urgent or emergency care is one day. Id. at ¶20; Dkt. No. 100-2 at 5. But that timeline may be extended based on extenuating circumstances, which Dr. Panos explains includes staffing shortages, institution lockdowns and the prison's response to COVID-19. Dkt. No. 100 at ¶15. The plaintiff generally contests these statements and says that his "painful abscessed tooth was ignored for seven (7) days . . . while the Defendants performed non-urgent dental procedures." Dkt. No. 125 at ¶6.

4. *The Plaintiff's Dental Treatment at Kettle Moraine*

Dental staff first discovered issues with the plaintiff's tooth #28 in 2013. Dkt. No. 99 at ¶21. Staff treated and replaced a lost filing in January 2013. Dkt. No. 100-1 at 1–2. A few days later, staff placed another filling in tooth #28, this one on the face of the tooth just above the gumline. Id. On August 21, 2015, Dr. Domrois (not a defendant) found a fistula on the tissue between teeth #27 and #28, prescribed antibiotics and recommended either an extraction or root canal therapy. Id. at 2–3. Dr. Kinziger explains that a dental fistula "is a pimple-like bump that can form to drain pus from [an] abscess." Dkt. No. 102 at ¶7. A dental abscess "is an infection at the end of the root of the tooth" that, if it persists, "can begin to drain through a fistula." Id.

Dr. Domrois saw the plaintiff again on September 3, 2015 and noted the fistula along teeth #27 and #28. Dkt. No. 100-1 at 4. Domrois again recommended extraction or root canal therapy, but the plaintiff reported that he was not in any pain and "[would] decide later" what he wanted to do about it. Id.; Dkt. No. 102 at ¶8. Dr. Domrois saw the plaintiff once more on March 3,

2017, and again noted the fistula. Dkt. No. 100-1 at 4–5. The defendants emphasize that the plaintiff did not submit any DSRs for any treatment or about any issue between August 2015 and June 2018. Dkt. No. 99 at ¶26.

a.    Tooth Extraction

On June 20, 2018, the plaintiff saw hygienist (and former defendant) Shier for a hygiene visit. Id. at ¶27. The plaintiff had no complaints before the visit; Shier noted that the fistula on teeth #27 and #28 had become chronic, the plaintiff had a cavity on tooth #19 and tooth #3 showed recession. Dkt. No. 100-1 at 10–12. The plaintiff told Shier that the fistula "ha[d] been there about a year, [did] not bother him at all." Id. at 12. Shier advised the plaintiff that the abscess was a chronic infection that if "left untreated can lead to other health issues." Id. The plaintiff told Shier that he "want[ed] to wait for release to get" root canal treatment, but he had several years remaining on his sentence. Id. The plaintiff's records show Dr. Kinziger as the provider, id. at 10, and Kinziger avers that he recommended the plaintiff undergo extraction of his abscessed tooth "to avoid any other health issues." Dkt. No. 102 at ¶12. Kinziger also discussed the plaintiff's partial denture and advised that the abscess and cavity "would need to be addressed via extraction and filling, respectively, before he could be considered for a new partial." Id. at ¶13. Dental staff told the plaintiff to submit a DSR "if he wanted to proceed with treatment of the abscess and cavity." Id. at ¶14; Dkt. No. 100-1 at 10 (notes showing the provider "rec[ommended] future extraction if pt [patient] would like new partial, advised pt to send DSR if he would like to proceed with tx [treatment]"). Kinziger avers

that he "did not believe there was any reason to immediately address the abscessed tooth" because the plaintiff did not complain about it and was not in distress during the June 20, 2018 appointment. Dkt. No. 102 at ¶15.

The plaintiff says that he at first saw only Shier for the cleaning on June 20, 2018, but that Shier consulted with Kinziger about "a bacterial infection at the gum line of his tooth" Dkt. No. 125 at ¶11. The plaintiff also contests that he opted to wait until his release for root canal therapy; he says that on June 18, 2018, he requested extraction of the abscessed tooth, and Bohn verbally told him he would be placed on the waitlist for extraction and filling. Id. at ¶¶4, 12. In support of these assertions, the plaintiff cites his amended complaint. Id. But as the court discussed above, the amended complaint is not evidence because it is not verified. The plaintiff claims that no defendant or non-defendant dental staff told him on June 20, 2018 to submit a DSR to be scheduled for extraction of the abscessed tooth. Id. at ¶14. He again claims that Bohn told him—*before* June 20, 2018—that he would be placed on the dental treatment waitlist for an extraction. But he again cites only his amended complaint in support of that assertion. Id. at ¶15.

Defendant Bohn avers that she "very rarely interacts with the hygienist's patients." Dkt. No. 104 at ¶5. She says she interacts with patients only if they have a question about their place on the waitlist for treatment. Id. Bohn says she is "very stringent about policies and procedures" and "would never have told [the plaintiff], or any other patient, that they would be seen without submitting a written request." Id. at ¶8. She says she does not have the

authority to move a patient from one waitlist to another or to move up a patient on the waitlist queue. Id. at ¶10.

The plaintiff did not file a DSR or request treatment between his June 20, 2018 appointment and November 25, 2018. Dkt. No. 99 at ¶32. On November 25, 2018, the plaintiff filed a DSR in which he asserted that he was told during his June 2018 teeth cleaning that he needed an extraction and a filling. Dkt. No. 100-1 at 25. He asked, "Can you inform me of how much longer I will be waiting for this procedure." Id. The plaintiff says this DSR shows that he asked the defendants during the June 20, 2018 appointment to extract his tooth, and that they failed to schedule the extraction. Dkt. No. 125 at ¶12.

Dr. Kinziger responded to the plaintiff's November 25, 2018 request the next day by telling him that he had placed the plaintiff on the routine waitlist for an appointment in "5 months or so" and that he "assume[d]" the plaintiff was "requesting either a filling or extraction." Dkt. No. 100-1 at 25. Kinziger noted that the plaintiff would be "on the list for 1 or the other – both will not be done at the same visit." Id. Kinziger explains that the procedures could not be done together because he would have to numb the plaintiff's entire mouth; Kinziger had only forty-five-minute appointments at Kettle Moraine, which would not be enough time to perform both procedures. Dkt. No. 102 at ¶17. Kinziger says that the plaintiff did not complain in the November 25, 2018 DSR that he was experiencing pain, swelling or discomfort, so Kinziger believed placing him on the routine list (rather than the urgent list) was appropriate. Id.

at ¶18. Kinziger further explains that patients can live with abscesses "for years," so long as they are not in discomfort—like the plaintiff did after the fistula was discovered in 2015. Id. at ¶20. He avers that for an abscess to be considered urgent, "there must be significant swelling or pain that prevents normal daily functions and sleep." Id. Kinziger says the plaintiff "knew that he was responsible for submitting a DSR if he wanted treatment or if he was experiencing pain or discomfort," but he nonetheless "waited five months to submit a DSR to request an extraction or filling." Id. at ¶19. In response, the plaintiff asserts that "[a]ny tooth abscess is serious," cites his amended complaint and reiterates that Bohn told him on June 18, 2018 that he was on the waitlist for treatment. Dkt. No. 125 at ¶¶17–18 (quoting Dobbey, 806 F.3d at 940).

On November 30, 2018, Dr. Kinziger left Kettle Moraine and transferred to another institution. Dkt. No. 99 at ¶38. He did not treat the plaintiff again. Id. After Kinziger left, Kettle Moraine did not have a full-time dentist until January 2, 2022, when Dr. Yang started. Id. at ¶39. Dr. Panos offered part-time coverage at Kettle Moraine, along with other non-defendant dentists. Id. A dentist remained available at Kettle Moraine but only two or three times per week. Id.

The plaintiff did not file another DSR until September 9, 2019, when he wrote, "Can you tell me when am I suppose [sic] to be seen by the dentist." Dkt. No. 100-1 at 26. He checked the boxes next to "Filling" and "Extraction (Tooth Pulled)." Id. Dr. Panos responded the next day by informing the plaintiff that he

13

was on the list to be seen, but that Panos could not provide an exact day when he would be called. Id. He told the plaintiff "will call you in when your name comes up." Id.

On September 10, 2019, the plaintiff sent a letter addressed to the Health Services Manager in which he complained about a delay in receiving dental treatment. Id. at 28–29. He said in the letter—as he had in the November 25, 2018, DSR—that while he was having his teeth cleaned, he "was informed [that he] needed a filling and had a[n] infection in a separate tooth that would require it to be pulled." Id. at 28. He wrote that, "During this visit [he] was also advised that [he] would be placed on the dental waiting list to be seen by the dentist for [his] dental problems." Id. The plaintiff claimed that he wrote to dental staff "in either February or March" of 2019, and that he "was informed [that he] was placed on the waiting list, that could take up to seven (7) months before [he] would be seen by the dentist." Id. The plaintiff complained that the delay "within the process of getting [his] dental needs fixed is really unexcusable [sic]." Id. at 29. He closed the letter by stating that he had "endured the pain long enough, and request[ed] that [his] medical needs be address[ed] immediately." Dr. Panos received the letter the next day and responded by again telling the plaintiff that he was on the waitlist and would be called when his name came up. Id. at 27. Panos says that the plaintiff "did not complain that he was in any specific pain in either the DSR or the letter to the HSM, so there was nothing more for [Panos] to do than inform [the plaintiff] he was on the wait list to be seen." Dkt. No. 100 at ¶21.

On September 12, 2019, Dr. Panos received another DSR from the plaintiff, dated September 11, 2019, in which he complained that he was in pain and requested to be seen immediately. Dkt. No. 100-1 at 30. The plaintiff wrote that his "medical needs can not [*sic*] wait the duration of [his] placement on the wait list." Id. Panos responded that the plaintiff "will be seen today" and placed the plaintiff on the essential waitlist. Id. The plaintiff was called for his appointment at 10:38 a.m. that day (September 12, 2019). Dkt. No. 100-1 at 13. At 11:03 a.m., an officer from the Health Services Unit called the plaintiff's unit officer to ask if the plaintiff was on his way. Id. The unit officer responded that the plaintiff "was still washing his face and slowing [*sic*] getting ready for his appointment." Id. Panos "decided to no show the patient" because of his "delay in arriving to dental in a timely manner." Id. He noted the appointment would be rescheduled "one more time according to policy." Id.

Dr. Panos explains that some days, the dental unit can work ahead of schedule because of cancelations or other circumstances, but other days the unit must delay appointments. Dkt. No. 100 at ¶24. He avers that if a patient has no legitimate reason for delaying an appointment when called, the unit will reschedule the appointment because the dental unit "has long wait lists and cannot wait long period of time [for] a patient to report." Id. Panos avers that if a patient does not report a justifiable reason for delaying an appointment, he "would assume the individual is not suffering from an emergent issue that requires immediate attention." Id. Panos does not remember what he did after

the plaintiff's appointment was no-showed, but he surmises that he may have fulfilled administrative duties or left to go to another institution. Id.

Later that day, the plaintiff sent another letter addressed to the Health Services Manager in which he explained why he missed his dental appointment. Dkt. No. 100-1 at 31. The plaintiff claimed that an officer woke him at around 10:40 a.m. and told him he had to report to the Health Services Unit. Id. The plaintiff says that twenty minutes later, as he was preparing to leave his cell, an officer told him the dentist "had went home" and had cancelled his appointment "as a result of it taking [him] to[o] long to leave the unit." Id. The plaintiff says he had "been battling something [he] believe[d] to be stomach flu" for the previous week, and he had not been able to sleep or eat. Id. He says he told an officer about his illness early that morning, so he was allowed to eat breakfast in his cell. Id. The plaintiff claimed that when the officer woke him up for his appointment, he "had to immediately empty [his] bowels; which was the cause of [his] delay." Id. at 31–32. He asserted that his stomach issues "should not be used as a means to deny [his] urgent dental needs." Id. at 32. He said that he still needed immediate and urgent treatment. Id. Dr. Panos did not receive or respond to this letter, but he since has reviewed it and notes that the plaintiff does not claim in the letter that his stomach issues were related to his abscessed tooth. Dkt. No. 100 at ¶49. Panos also reviewed the plaintiff's medical records, which contain no mention of stomach issues, vomiting, upset stomach or diarrhea related to his dental issues anytime between January 2019 and March 2020. Id.

On September 17, 2019, Dr. Panos received another DSR from the plaintiff (dated September 16, 2019), in which he complained that he "still need[s] to be <u>IMMEDIATELY</u> seen for the painful abscess tooth." Dkt. No. 100-1 at 35 (emphasis in original). Panos responded by placing the plaintiff on the essential waitlist. <u>Id.</u> Two days later, on September 19, 2019, at 9:08 a.m., Dr. Urbanowicz (not a defendant) saw the plaintiff and extracted tooth #28 without complication. Dkt. No. 99 at ¶47; Dkt. No. 100-1 at 13. Panos avers that the plaintiff's September 12, 2019 appointment was rescheduled for September 19, 2019, and that is why Urbanowicz saw him that day and performed the extraction. Dkt. No. 100 at ¶27; <u>see</u> Dkt. No. 100-1 at 35 (response noting that the plaintiff was "seen 9/19/19").

The plaintiff claims he was seen for the extraction on September 19, 2019 only after an officer called the Health Services Unit to report his need for immediate dental care. Dkt. No. 125 at ¶25. He cites no evidence (only his amended complaint) in support of that assertion, and the defendants say no evidence exists that any officer called the dental services unit that day about the plaintiff. Dkt. No. 99 at ¶48. The defendants cite a copy of a page from the Unit Logbook for Housing Unit 8, where the plaintiff was housed on September 19, 2019. Dkt. No. 101 at ¶10; Dkt. No. 101-5. The logbook page has the notation "Sgt. Meinburg" next to entries for 7:40 a.m. and 11:40 a.m., but these entries do not say that Meinburg (or any officer) called health services or dental services. <u>Id.</u> The plaintiff says Meinburg is the officer who called dental services to report the plaintiff's need for immediate dental care. Dkt. No. 125 at

¶27. He cites a declaration he filed in support of his motion to appoint counsel, in which he avers that he and another officer named Timothy Benike were "present when correctional officer Chad Meinburg . . . called KMCI's dental staff to request that [the plaintiff] receive immediate dental care on September 19, 2019." Id.; Dkt. No. 119.

        b.    Tooth Filling

On September 25, 2019, the plaintiff sent another letter to the Health Services Manager. Dkt. No. 100-1 at 37. The plaintiff wrote in the letter that "the lady that was assisting the dentist" on September 19, 2019 told him "that [his] name would be placed on the waiting list to get a filling in a separate tooth." Id. He says "the same lady" told him at his June 20, 2018 teeth cleaning that he would be on the waitlist for the extraction, but his name was never added to the list. Id. The plaintiff does not complain that he was in any pain from the tooth that needed a filling and asks only "whether or not [his] name has been placed on the dental waiting list." Id. Dr. Panos responded on September 28, 2019 that the plaintiff would be placed on the waitlist for a filling. Id. at 36. The plaintiff avers that it was Bohn who "misleadingly advised" him on both June 20, 2018 (not June 18, 2018, as he previously asserted) and September 19, 2019 that he would be placed on the waitlist to be seen. Dkt. No. 125 at ¶28.

On October 4, 2019, Dr. Panos saw the plaintiff for a post-operation visit in response to a DSR the plaintiff submitted complaining that his extraction site was bleeding. Dkt. No. 100-1 at 14, 38. Panos noted that the tissue around

the extracted tooth was "closed" and there was "no bleeding." Id. at 14. He advised the plaintiff to keep the area clean for the next six to eight weeks to allow it to heal. Id.

On January 20, 2020, the plaintiff submitted a DSR requesting "to be seen ASAP to fill [his] tooth" because it had become "extremely sensitive." Id. at 47. Dr. Panos responded the next day by placing the plaintiff on the routine waitlist for a filling. Id. at 14, 47. Panos explains that "sensitivity" is subjective; in his experience, "If someone is in a significant amount of pain, they will usually indicate in their DSR that their tooth is specifically causing them pain or they cannot eat, drink, or sleep, which helps indicate the severity of their condition." Dkt. No. 100 at ¶32. The plaintiff contends that Panos should have known by his use of the words "extremely sensitive" that he was in pain. Dkt. No. 125 at ¶30.

The plaintiff did not file another DSR until March 12, 2020, which the dental services unit received four days later. Dkt. No. 100-1 at 48. The plaintiff said that his tooth "still has a visible hole that needs to be filled," and he claimed for the first time that it "ha[d] become painful." Id. Dr. Yang responded to the DSR, told the plaintiff he was "on the list" and advised him to "Please be patient." Id.

On March 16, 2020—the same day Dr. Yang responded to the plaintiff's March 12, 2020 DSR—the plaintiff submitted another letter addressed to the Health Services Manager complaining that he had "been repeatedly placed on the waiting list" for a tooth filling since "dental staff told [him] in 2018" that he

needed it. Id. at 51. He said—as he had in his March 12, 2020 DSR—that "the tooth has become painful." Id. He asserted that the "dental staff needs to be compelled to fill [his] tooth as soon as possible." Id.

Around this time in March 2020, the DOC began restricting all non-urgent or emergency care because of COVID-19. Dkt. No. 99 at ¶57; Dkt. No. 100-3. On March 23, 2020, Dr. Man Lee, the Dental Director at the time, sent out an email informing dental staff to see only essential patients and to postpone hygiene appointments. Dkt. No. 99 at ¶58; Dkt. No. 100-4. DOC dental units stopped seeing patients for hygiene or routine cases and saw only patients who needed urgent or emergency care, such as abscessed teeth that needed to be extracted. Dkt. No. 99 at ¶59. Dental staff did not perform fillings because they lacked equipment and protective equipment to keep staff and patients safe from aerosol droplets created during the procedure. Id. at ¶60.

Nursing staff informed Dr. Yang about the plaintiff's March 16, 2020 letter, and he brought the plaintiff in for a "limited oral examination" to assess his pain. Dkt. No. 100-1 at 14. Yang informed the plaintiff that he could not perform a filling because of the COVID-19 restrictions and could perform only an extraction of the painful tooth. Id.; Dkt. No. 103 at ¶7. The plaintiff "claimed that there was pain, but not enough to have the tooth pulled." Dkt. No. 100-1 at 14–15. Yang told the plaintiff that he saw the plaintiff's January 2020 DSR "and that he needs to wait if he wants a filling." Id. The plaintiff refused an extraction and signed a refusal of care form. Id. at 14, 19. That form, dated

March 17, 2020, says the plaintiff refused extraction of tooth #19 and told Yang "he want[ed] it filled and will wait his turn for filling." Id. at 19.

Between March and August 2020, the plaintiff filed several DSRs in which he complained of pain and requested a filling. Dkt. No. 100-1 at 15, 52–55. Dr. Yang responded to those requests by explaining the DOC's COVID-19 policies, informing the plaintiff that he was on the waitlist to be seen when available and reminding him that he could request extraction of the tooth if the pain worsened. Id.; Dkt. No. 103 at ¶8. Drs. Yang and Panos explain that although the plaintiff complained of being in pain, many other incarcerated persons "were experiencing similar or worse pain and were also waiting for treatment." Dkt. No. 103 at ¶9; Dkt. No. 100 at ¶44. Panos avers that dental staff did not have the authority to modify safety protocols for individual patients during COVID-19, so they could not perform the filling for the plaintiff. Dkt. No. 100 at ¶43. He explains that because of the "unprecedented event" of the pandemic, many incarcerated persons had to wait longer than usual for non-essential dental services. Id. at ¶48. He avers that the goal of the DOC's COVID-19 policy "was to find a balance between providing appropriate services and providing the safest environment for both staff and inmates." Id.

Between March and September 2020, staff modified the dental unit at Kettle Moraine to allow dental staff to see patients for non-emergency and routine treatment. Dkt. No. 99 at ¶66. Staff at Kettle Moraine again began completing fillings in September 2020, but the plaintiff did not file another DSR about his filling until January 27, 2021, which dental staff received the next

day. Id. at ¶67; Dkt. No. 100-1 at 59. The plaintiff complained that he had "patiently waited to get a filling," and that his tooth had "chipped and [he was] in really urgent need to get this filling or [he] risk[ed] losing the tooth." Dkt. No. 100-1 at 59. Dr. Yang responded that the plaintiff was "on the list," and that he needed "to wait [his] turn like everyone." Id. Yang completed the filling on the plaintiff's tooth on February 1, 2021. Id. at 16–17. He avers that the plaintiff's filling "was done as soon as was possible according to his place on the waiting list and COVID safety procedures." Dkt. No. 103 at ¶11. The plaintiff claims that his painful tooth constituted an "urgent dental condition that necessitated dental care within either 24 or 72 hours," despite the ongoing COVID-19 pandemic. Dkt. No. 125 at ¶34.

### 5. Defendant Doehling's Involvement

Defendant Doehling avers that the former Health Services Manager left Kettle Moraine in June 2019. Dkt. No. 106 at ¶5. There was no Health Services Manager from June to September 2019, when Ludwig began in that position. Id. Doehling provided administrative coverage for the Manager position during those months in her position as Nursing Coordinator. Id. at ¶6. She avers that she did not know about any of the plaintiff's dental complaints, did not receive letters or other correspondence from him while she provided Manager coverage and did not triage his DSRs, which only dentists review and triage. Id. at ¶7. The Dental Director, not Doehling, was responsible for reviewing dental complaints that incarcerated patients filed through the institution's complaint review system. Id. at ¶8.

6. *Defendant Ludwig's Involvement*

Ludwig's first day as Health Services Manager at Kettle Moraine was September 16, 2019. Dkt. No. 105 at ¶2. On around September 17, 2019, an institutional complaint examiner contacted Ludwig in her capacity as Health Services Manager about an institutional complaint the plaintiff had filed in which he requested immediate treatment after missing his dentist appointment with Dr. Panos on September 12, 2019. Id. at ¶¶13–14; Dkt. No. 101-1 at 2. The plaintiff's complaint listed his stomach issues as the reason he missed his appointment. Dkt. No. 101-1 at 13.

Ludwig spoke with an officer at the Health Services Unit, who informed her that the plaintiff "was called several times for his appointment, but he did not appear to be in a hurry to report." Dkt. No. 105 at ¶14. The officer told her that each time he called the plaintiff he "waited 20 minutes before calling again (would estimate 3x)." Dkt. No. 101-1 at 2. Ludwig avers that the officer did not inform her that the plaintiff was feeling ill or dealing with a stomach issue on September 12, 2019. Dkt. No. 105 at ¶14. The institutional complaint examiner concluded that dental staff "did their due diligence in trying to contact the inmate for a dental appointment," but that the plaintiff nonetheless "[f]ailed to report for his appointment." Dkt. No. 101-1 at 2.

On September 20, 2019, Ludwig responded to the plaintiff's September 12, 2019 letter—in which he also identified his stomach issues as the reason for his missed appointment—by telling him "that the issue had been addressed per the inmate complaint process." Dkt. No. 105 at ¶15; Dkt. No. 100-1 at 33.

23

By that time, the plaintiff had seen Dr. Urbanowicz and had his abscessed tooth extracted. Dkt. No. 100-1 at 13.

On around March 19, 2020, an institutional complaint examiner again contacted Ludwig regarding a complaint the plaintiff had filed about not receiving a filling. Dkt. No. 105 at ¶18; Dkt. No. 101-2 at 2. Ludwig responded that fillings would not be provided to any patient because they were "not considered part of an essential dental plan," and non-essential care was postponed because of COVID-19. Dkt. No. 101-2 at 2. The institutional complaint examiner recommended dismissing the plaintiff's complaint. Id.

Ludwig avers that she defers to a dentist's clinical judgment and best practices for developing a plan of care for patients. Dkt. No. 105 at ¶21. Ludwig did not believe that the plaintiff's concerns were inappropriately addressed, so she did not request that he receive an additional dental evaluation. Id. at ¶20.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. Disputes about proposed facts "that are not outcome-determinative are not material and

will not preclude summary judgment." <u>Montgomery v. Am. Airlines, Inc.</u>, 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Allegations, speculation and argument alone are "insufficient to avoid summary judgment." <u>Cooper v. Haw</u>, 803 F. App'x 942, 946 (7th Cir. 2020); <u>Van Diest Supply Co. v. Shelby Cty. State Bank</u>, 425 F.3d 437, 439 (7th Cir. 2005). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in the non-moving party's favor. <u>Brummett v. Sinclair Broad. Grp., Inc.</u>, 414 F.3d 686, 692 (7th Cir. 2005).

B.   <u>Analysis</u>

The court reviews the plaintiff's claims that the defendants denied him proper medical care under the Eighth Amendment. <u>Gabb v. Wexford Health Sources, Inc.</u>, 945 F.3d 1027, 1033 (7th Cir. 2019); <u>Pyles v. Fahim</u>, 771 F.3d 403, 408 (7th Cir. 2014). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976). To succeed on his Eighth Amendment claims, the plaintiff must present evidence showing both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016) (<i>en banc</i>) (citing <u>Farmer v. Brennan</u>, 511

U.S. 825, 834 (1994)). A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). The defendant must have had "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018). Showing deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" Rasho v. Jeffreys, 22 F.4th 703, 710 (7th Cir. 2022) (quoting Rosario v. Brawn, 670 F.3d 816, 821 (7th Cir. 2012)).

The court previously explained that the Seventh Circuit has held that a dental abscess is a serious medical condition that requires "prompt medical treatment." Dkt. No. 11 at 12–13 (quoting Dobbey, 806 F.3d at 940) ("A tooth abscess is not a simple toothache. It is a bacterial infection of the root of the tooth, and it can spread to the adjacent gum and beyond—way beyond. It is often painful and can be dangerous."). The defendants do not contest that a dental abscess (such as the one the plaintiff developed as early as 2015) can be a serious medical condition that satisfies the objective element of an Eighth Amendment claim.

The plaintiff asserts that the defendants failed to provide him treatment in a timely manner, which caused him prolonged and unnecessary pain. A delay in treating "painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."

Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" Id. (quoting McGowan, 612 F.3d at 640).

Neither negligence nor medical malpractice violates the Eighth Amendment. See Estelle, 429 U.S. at 106; Brown v. Peters, 940 F.3d 932, 937 (7th Cir. 2019). A medical professional who makes a mistake despite exercising his professional judgment may have been negligent, but he cannot be considered deliberately indifferent. See Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); Williams v. Van Buren, No. 22-2918, 2023 WL 3451407, at *2 (7th Cir. May 15, 2023) (citing Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010) ("Being wrong is not inconsistent with exercising professional judgment.").

C.    The Plaintiff's Claims

The plaintiff did not respond to the defendants' assertions that defendants Bohn, Yang, Doehling and Ludwig were neither deliberately indifferent nor negligent to his dental needs. He did not mention Doehling or Ludwig in his response brief. Instead, his response brief focuses on his claims against Drs. Kinziger and Panos. Dkt. No. 126 at 3–9. The court will consider the defendants' arguments as to Bohn, Yang, Doehling and Ludwig to be uncontested for purposes of this decision.

The plaintiff also asserts that he is proceeding against Dr. Panos on a claim of negligence under state law. Dkt. No. 126 at 7–8. But the court did not allow the plaintiff to pursue a negligence claim against Panos; the court allowed the plaintiff to proceed under state law only against Does #6 through #8, who he later identified as Dr. Yang. Dkt. No. 11 at 19–20; Dkt. No. 53 at 1–3. The court will not consider the plaintiff's arguments related to a negligence claim against Panos on which the court did not allow him to proceed.

       1.    *Dr. Kinziger*

It is undisputed that Dr. Kinziger saw the plaintiff on June 20, 2018 for what began as a routine cleaning, though the plaintiff asserts that Kinziger did not join the appointment until Shier (the hygienist) asked that the dentist look at the plaintiff's fistula. It is undisputed that the plaintiff had no complaints of pain during this appointment, and he confirmed that the fistula had "been there about a year." Dkt. No. 100-1 at 12. It also is undisputed that dental staff told him during the June 20, 2018 appointment that he needed an extraction and a filling.

Both Shier's and Kinziger's appointment notes show that the plaintiff did not request an extraction at the time, despite them advising the plaintiff that his condition could worsen or lead to other issues if left untreated. Kinziger's notes show that he "advised [the plaintiff] that area has chronic infection, rec[ommended] future extraction." Dkt. No. 100-1 at 10. Kinziger similarly told the plaintiff that he could provide a new partial denture but "informed [the plaintiff] that abscess on 28 . . . would need to be addressed before he would be

considered for eligibility for new partial." Id. at 11. Shier's notes show that she informed the plaintiff "that past dx [diagnosis] was abscess which is a chronic infection, left untreated can lead to other heal issues." Id. at 12. The plaintiff reported that "it ha[d] been there about a year, [did] not bother him at all. [S]tate[d] he wants to wait for release to get a RCT [root canal therapy]." Id. Shier and Kinziger advised the plaintiff to submit a DSR if he changed his mind and wanted to have his tooth extracted and the cavity filled. Id. Kinziger avers that because the plaintiff did not complain of pain during the appointment and was not in distress, he did not believe the plaintiff needed immediate treatment of the abscessed tooth. It is undisputed that the plaintiff did not file a DSR about being scheduled for an extraction until November 25, 2018, and in that DSR he did not claim to be in pain. Kinziger responded to the plaintiff's request and placed him on the routine waitlist for an extraction.

The plaintiff disputes Kinziger's recollection of events and says no one told him in June 2018 that he needed to file a DSR to be scheduled for the extraction. He says that he requested an extraction during the June 2018 appointment.[4] He asserts that staff not only recommended the extraction and filling but also *scheduled* those procedures, or told him that they would schedule them. That is why he asked in his DSR five months later *when* he

_____

[4] The plaintiff also says Bohn told him two days earlier that she would put him on the waitlist for treatment, but there is no evidence that the plaintiff interacted with any defendant on June 18, 2018. Elsewhere in his response materials, the plaintiff says he spoke with Bohn on June 20, 2018, not June 18. See Dkt. No. 125 at ¶¶11, 28. It appears the plaintiff may have incorrectly listed June 18, 2018—rather than June 20, 2018—as the first date when he spoke with Bohn.

would receive those procedures, rather than asking them to schedule the procedures in the first place. Dkt. No. 100-1 at 25. He says his November 25, 2018 DSR confirms that staff falsely told him during his June 2018 appointment that they would place him on the waitlist. The plaintiff cites only his amended complaint in support of these statements; as the court has explained, the amended complaint is not evidence because it is not verified.

The court finds that there is a dispute of fact whether the plaintiff requested extraction of his tooth during the June 20, 2018 appointment or whether Dr. Kinziger recommended extraction during that appointment but the plaintiff declined it. But this dispute of fact does not foreclose summary judgment in favor of defendant Kinziger. It is undisputed that the plaintiff was not in pain or distress during the June 2018 appointment. He did not file a DSR about his extraction for five months, suggesting that he was not in urgent need of an extraction. When finally he did file a DSR, the plaintiff still did not say he was in pain, discomfort or distress. He merely asked when his extraction would be scheduled. Kinziger reasonably concluded that the plaintiff did not have an emergency dental need, responded to the plaintiff's DSR and placed him on the routine waitlist—not the essential or urgent waitlist. That the plaintiff had to wait for this non-urgent care does not support his claim of deliberate indifference. Having to wait for non-emergency medical treatment is a fact of life, even for non-incarcerated persons; it is not a constitutional violation. See Moore v. Williams, 835 F. App'x 143, 145 (7th Cir. 2021) (citing

Knight v. Wiseman, 590 F.3d 458, 466 (7th Cir. 2009)) (noting that "the Constitution does not mandate immediate care.").

A reasonable jury could not conclude that Dr. Kinziger was deliberately indifferent to the plaintiff's dental condition when he placed the plaintiff on the routine waitlist. The plaintiff asserts that Kinziger should have extracted the plaintiff's tooth during the June 2018 appointment because "[a]ny tooth abscess is serious." Dkt. No. 126 at 6 (quoting Dobbey, 806 F.3rd ay 940). That may be true of an acute abscess, but Kinziger explains that the plaintiff's abscess was chronic, which means it could have been left alone if the patient was not uncomfortable. Dkt. No. 102 at ¶20; Dkt. No. 100-1 at 10–12; see also Karim v. Obaisi, Case No. 14 C 1318, 2017 WL 4074017, at *5 n.9 (N.D. Ill. Sept. 14, 2017) (citing Dobbey v. Mitchell-Lawshea, No. 12 C 1739, 2014 WL 702352, at *7 (N.D. Ill. 2014), rev'd on appeal, 806 F.3d 938, and explaining differences between acute abscess—which the plaintiff in Dobbey had—and chronic abscess). Unlike the plaintiff in Dobbey, it is undisputed that the plaintiff in this case, despite having a known abscess, denied being in pain or discomfort during the June 2018 appointment or in the DSR he filed months later. It is undisputed that the plaintiff had had the fistula since 2015 but had not complained of it causing him pain or discomfort. The plaintiff presented no sense of urgency and provided Kinziger no reason to know that his abscess was painful or affecting his daily activities. Without reason to know that the plaintiff was in pain or discomfort and required immediate care, Kinziger cannot be found deliberately indifferent for not providing that care. See Dobbey, 806 F.3d

at 940 (explaining that a dentist "demonstrates deliberate indifference by failing to treat the patient promptly . . . *while knowing* that the patient may well be in serious pain") (emphasis added); <u>Ayoubi</u>, 724 F. App'x at 474 (noting that to be deliberately indifferent, defendant must have "actual, *personal knowledge* of a serious risk" and fail to respond reasonably to it) (emphasis added). Because there is no evidence from which a reasonable jury could find that Dr. Kinziger knowingly disregarded the plaintiff's pain from his abscessed tooth between June and November 2018, he is entitled to a judgment as a matter of law.

### 2. *Dr. Panos*

The plaintiff's claim against Dr. Panos has multiple parts, each of which raises a claim of deliberate indifference. The court will address each separately.

#### a. Missed Appointment (September 12, 2019)

The plaintiff first claims that Panos was deliberately indifferent to his need for an extraction of his abscessed tooth when he declined to see the plaintiff on September 12, 2019. Dkt. No. 126 at 3. The undisputed evidence shows that on September 12, 2019, Panos received the plaintiff's DSR requesting immediate treatment and placed him on the essential waitlist to be seen that day. At 10:38 a.m., an officer called the plaintiff for his appointment but the plaintiff did not immediately report to be taken to the Health Services Unit. After waiting twenty-five minutes, Panos determined that the plaintiff was a no-show and cancelled the appointment. On September 17, 2019, Panos received a DSR from the plaintiff again requesting immediate care because his

abscessed tooth was causing him pain. Panos responded by placing the plaintiff on the essential waitlist. Two days later, a non-defendant dentist extracted the plaintiff's tooth.

The defendants assert that Dr. Panos was not deliberately indifferent for cancelling the appointment after the plaintiff failed to show up for it because, according to a nearby officer, the plaintiff was taking his time washing up for his appointment. The plaintiff disputes that account and asserts that he had flu-like symptoms that impacted his ability to timely attend his appointment. He says that during the twenty-five-minute delay, he was violently emptying his bowels and brushing his teeth. Dkt. No. 126 at 3. He says he told an officer about his illness earlier that morning. There is no statement from that officer (or any other) corroborating the plaintiff's account of the reason for his delay.

The plaintiff asserts that Dr. Panos knew the plaintiff was experiencing flu-like symptoms on September 12, 2019 and Panos should have prescribed him medication or called him for an immediate appointment despite the plaintiff's delay. But the undisputed evidence shows that on September 12, 2019, Panos *was not* aware that the plaintiff was experiencing flu symptoms because the plaintiff did not tell Panos that he was. The DSR that Panos received and responded to on September 12, 2019 said only that the plaintiff needed to be seen immediately for his medical needs, including pain. There was no mention of flu-like symptoms or stomach issues, which the plaintiff says had been ongoing for a week by then. See Dkt. No. 100-1 at 31.

The plaintiff explained his stomach issues to medical staff for the first time in the September 12, 2019 letter that he wrote to the Health Services Manager *after* he missed the morning appointment. But on September 12, 2019, Kettle Moraine had no Health Services Manager because Ludwig had not started yet; her first day was September 16, 2019. There is no evidence that Dr. Panos saw this letter. The plaintiff also mentioned his stomach issues in an institutional complaint he filed September 12, 2019, also after he missed his appointment. There is no evidence that Panos saw this complaint. The institutional complaint examiner's office received it five days later, on September 17, 2019. Dkt. No. 101-1 at 1–2. A complaint examiner sent Ludwig the plaintiff's institutional complaint on around September 17, 2019, the same day the complaint examiner's office received it. Ludwig spoke with a unit officer, who said nothing about the plaintiff complaining that stomach issues prevented him from making his appointment. On September 17, 2019, Ludwig referred the information from the officer about the plaintiff's missed appointment to the complaint examiner, and the complaint examiner dismissed the complaint on September 23, 2019. Id. at 2. On September 20, 2019, Ludwig responded to the plaintiff's September 12, 2019 letter.

There is no evidence that Dr. Panos ever read or was aware of the plaintiff's letter or that anyone at the prison read it before Ludwig responded to it on September 20, 2019. By that time, the plaintiff had seen a dentist and had his abscessed tooth extracted. Nor is there evidence that Panos ever read or was aware of the plaintiff's institutional complaint in which he discussed his

illness; the complaint examiner contacted only Ludwig about it. Ludwig contacted a unit officer (not Panos) about the complaint, and the complaint examiner dismissed it on September 23, 2020, also after the plaintiff had undergone the extraction of his abscessed tooth.

The evidence would not allow a reasonable juror to conclude that Dr. Panos was deliberately indifferent to the plaintiff's pain or stomach issues when he cancelled the plaintiff's appointment on September 12, 2019. The undisputed evidence shows that Panos cancelled the appointment after twenty-five minutes because the plaintiff failed to show up for it. The evidence also shows that the earliest that any defendant was aware of the plaintiff's stomach issues was September 17, 2019, when Ludwig spoke to the institutional complaint examiner about the plaintiff's complaint mentioning his stomach issues as the reason for his missed appointment. There is no evidence that Panos was ever aware of the plaintiff's stomach illness or of his letter and complaint discussing it. Nor is there evidence that the complaint examiner informed Panos (or any defendant) about the plaintiff's claim of stomach issues. Panos cannot be held liable for not detecting and treating the plaintiff's stomach issues of which he was never aware, or for not taking those stomach issues into account when canceling the appointment when he was not aware of them.

b.    Rescheduled Appointment (September 19, 2019)

The plaintiff next claims that Dr. Panos was deliberately indifferent when he failed to reschedule the plaintiff's missed appointment sooner than

September 19, 2019. The plaintiff claims he was seen on September 19, 2019 only after correctional officer Meinburg called the Health Services Unit to report his need for immediate care. In a declaration not included with his summary judgment response, the plaintiff averred that he and Officer Benike witnessed Meinburg call "dental staff to request that [the plaintiff] receive immediate dental care on September 19, 2019." Dkt. No. 119. The plaintiff says this shows that he needed prompt treatment, and that Panos was deliberately indifferent by not rescheduling his missed appointment sooner.

The defendants do not dispute that Meinburg was on duty on September 19, 2019, but they say there is no evidence that he called the Health Services Unit. They cite a page of the Unit Logbook from September 19, 2019, which lists Meinburg's name but does not say that he called health services. Dkt. No. 101-5. The logbook lists Meinburg's name next to 7:40 a.m. and 11:40 a.m. Id. That suggests Meinburg may have been on duty at those times on September 19, 2019, but it says nothing about his actions or duties that day. The defendants say that the plaintiff was seen for treatment on September 19, 2019, not because of an officer's call but because that was when Dr. Panos rescheduled his appointment in response to the plaintiff's DSR claiming he needed immediate treatment. Panos avers that he scheduled the plaintiff for treatment on September 19, 2019 because that "was the next available appointment with a dentist." Dkt. No. 100 at ¶25.

The court finds that there is a dispute of fact about Meinburg and whether he called health services on September 19, 2019. But that dispute is

immaterial because there is no evidence that the plaintiff could have been seen sooner for his tooth extraction. Dr. Panos explained that he did not immediately reschedule the plaintiff after he missed the September 12, 2019 appointment because the plaintiff no-showed, which suggested that his need for treatment was not urgent. Panos did not receive another DSR from the plaintiff about his painful tooth until five days later, on September 17, 2019, at which time the plaintiff requested to be seen "IMMEDIATELY." Dkt. No. 100-1 at 35. Panos responded by placing the plaintiff on the essential waitlist for the next available appointment, which was two days later—on September 19, 2019. Panos avers that was the earliest dentist appointment available. It is undisputed that there was no full-time dentist at Kettle Moraine in September 2019; Dr. Kinziger had left and was not immediately replaced. Panos worked at Kettle Moraine only part-time, and a dentist was available only two or three days per week. Prison policy required treating urgent dental needs within seventy-two hours (or three working days) for prisons without fulltime dentists. Dkt. No. 100-2 at 5. That requirement was satisfied when Dr. Urbanowicz performed the extraction at 9:09 a.m. on September 19, 2019—two days after Panos received the plaintiff's DSR. Dkt. No. 100-1 at 13. There is no evidence suggesting that another dentist was available at Kettle Moraine to perform the extraction sooner.

The Seventh Circuit has explained that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing

treatment." Petties, 836 F.3d at 730. There is no evidence that the two-day delay the plaintiff experienced in having his abscessed tooth extracted was a result of Dr. Panos's deliberate indifference or disregard of his medical condition. Instead, the evidence shows that Panos rescheduled the plaintiff's appointment based on the no-show for the September 12, 2019 appointment and the five-day delay between the plaintiff's requests for treatment, which suggested to Panos that the condition was not serious. As the court discussed above, there also is no evidence that Panos was aware of the plaintiff's stomach issues or could have suspected that those issues were caused by the plaintiff's tooth abscess. Panos also considered the availability of a dentist to perform the extraction, which affected "the ease of providing treatment." Id. He scheduled the plaintiff's extraction in line with prison policy for prisons without full-time dentists, which meant the plaintiff received treatment within seventy-two hours or three working days of his DSR. The evidence shows that the delay the plaintiff experienced was based on Panos's "reasonable medical judgments or w[as] a result of the prison bureaucracy." Dent v. McBride, 751 F. App'x 915, 919 (7th Cir. 2018) (citing Wilson v. Adams, 901 F.3d 816, 821–22 (7th Cir. 2018)). A reasonable jury could not conclude that Dr. Panos was deliberately indifferent to the plaintiff's need for a tooth extraction.

c.    Delay in Filling (September 2019 to January 2020)

The plaintiff also claims that Dr. Panos was deliberately indifferent to his need for a filling between September 2019 and January 2020. The evidence shows that on September 25, 2019, about a week after having his tooth

extracted, the plaintiff again wrote to the Health Services Manager about what he perceived to be a delay in receiving a filling on a different tooth. He did not complain of being in pain but asked only if he was on the waitlist for a filling. Panos responded three days later and told the plaintiff that he would be added to the waitlist for a filling.

The plaintiff did not send another DSR about his filling until January 20, 2020, when he complained that his tooth was "extremely sensitive." Dkt. No. 100-1 at 47. Dr. Panos responded the next day by noting that the plaintiff was on the routine waitlist. The plaintiff did not file another DSR about his filling until March 12, 2020; in that DSR, for the first time, he said his tooth had "become painful." Id. at 48. Dr. Yang (not Panos) responded to that DSR.

The undisputed evidence shows that the plaintiff never told Dr. Panos between September 2019 and January 2020 that his tooth was causing him pain and that he needed immediate treatment. His DSRs told Panos only that his tooth was "sensitive," which is not the same as "painful." It was not until his March 12, 2020 DSR that the plaintiff said his tooth had "*become* painful," which suggests that that was the first time the tooth was causing him pain. The plaintiff's September 2019 DSRs about his abscessed tooth showed that he knew how to tell dental staff that he was in pain and needed immediate treatment. Panos could reasonably infer that the plaintiff's tooth was not causing him pain from September 2019 to January 2020 because the plaintiff did not say that it was.

As the court explained above, having to wait for non-urgent dental care is not a constitutional violation, whether the patient is incarcerated or not. See Moore, 835 F. App'x at 145; Knight, 590 F.3d at 466. The plaintiff did not notify Dr. Panos between September 2019 and January 2020 that he was experiencing pain and needed immediate treatment. Panos reasonably interpreted the plaintiff's DSR as requesting routine, non-urgent care for a tooth that needed a filling and was "sensitive" at worst. He reasonably responded to the plaintiff's concern by placing him on the routine, non-urgent waitlist. Panos provided adequate care in response to the plaintiff's need. See Farmer, 511 U.S. at 832 (Eighth Amendment entitles prisoners to "adequate . . . medical care"). A reasonable jury could not conclude that Panos disregarded the plaintiff's serious medical condition by not scheduling him to be seen sooner for a filling in his "sensitive" tooth. Dr. Panos is entitled to judgment as a matter of law.

3.    *Dental Assistant Bohn*

The plaintiff claims that Bohn was deliberately indifferent to his need for an extraction when she verbally told him that he would be placed on the dental treatment waitlist during his June 2018 appointment.[5] He says that Bohn

---

[5] The plaintiff also asserts that Bohn falsely told him she would place him on the waitlist for a filling during the September 19, 2019 extraction of his abscessed tooth. See Dkt. No. 100-1 at 37 (plaintiff's letter to Health Services Manager claiming that "the lady that was assisting the dentist" on September 19, 2019 told him "that [his] name would be placed on the waiting list to get a filling in a separate tooth."). The court did not allow the plaintiff to proceed on a separate claim based on this allegation, but the following analysis would be the same for that claim.

never placed him on the waitlist, which led to an unnecessary delay in his treatment. Bohn disputes the plaintiff's claim and avers that she would never tell any patient that he would be placed on the waitlist for treatment without submitting a written request. She reiterates that only dentists triage DSRs and place patients on waitlists; as a dental assistant, she does not have that responsibility or authority.

Even if the plaintiff's version of the events is correct—that Bohn verbally told him she would schedule him on the waitlist for a follow-up appointment—there is no evidence that Bohn deliberately and intentionally or recklessly refused or failed to schedule a follow-up appointment. The plaintiff does not assert this in his response materials. What is more possible, even more likely, is that *if* Bohn had departed from her normal course of action and told the plaintiff that she would put him on the waitlist for a future appointment, she simply forgot to do so. It is undisputed that the plaintiff did not complain of pain during the June 20, 2018 appointment. Nor did the plaintiff express a sense of urgency for an extraction. It would therefore be understandable if Bohn simply forgot to schedule a follow-up appointment for the plaintiff. One cannot intentionally forget to do something. But *if* Bohn had told the plaintiff that she'd put him on the waitlist, a finding that Bohn forgot or otherwise failed to schedule the plaintiff for the follow-up appointment, like he says she told him she would, would amount to negligence or malpractice at most; neither of those violates the Constitution. See Estelle, 429 U.S. at 106; Brown, 940 F.3d at 937.

Alternatively, there may have been a misunderstanding between dental staff and the plaintiff about future treatment. It may be that dental staff (whether Dr. Kinziger, Shier, Bohn or a combination of the three) told the plaintiff to submit a DSR to be placed on the waitlist for future treatment (whether the extraction, filling or both). The plaintiff may have interpreted their comments to mean that *they* would place the plaintiff on the waitlist for future treatment, not that *he* had to *request* to be placed on the waitlist. The plaintiff may sincerely believe that Bohn told him she had placed or would place him on the waitlist, when in fact she told him only to submit a DSR if he wanted to be placed on the waitlist. But neither Bohn nor any other defendant could be said to have been *deliberately* indifferent or to have *disregarded* the plaintiff's need for treatment based on a misunderstanding.

Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could not conclude that Bohn intentionally disregarded the plaintiff's need for treatment by falsely telling him that she would place him on the waitlist for an extraction. The evidence would allow a reasonable jury to find, at most, that Bohn was negligent or committed malpractice or that there was a misunderstanding between her and the plaintiff about future treatment. Because none of those violates the Eighth Amendment, Bohn is entitled to judgment as a matter of law.

4. *Dr. Yang*

The plaintiff claims that Dr. Yang was deliberately indifferent by failing to schedule him immediately for a filling of his painful tooth. The plaintiff asserts

that there was no reason for Yang not to treat his filling as an urgent or emergent condition that required immediate treatment, even in March 2020 under the DOC's COVID-19 restrictions.

It is undisputed that the plaintiff did not complain about pain causing his need for a filling until his March 12, 2020 DSR, and dental staff did not receive that request until March 16, 2020. By then, the DOC had implemented state-wide policies restricting non-essential dental care. Dr. Yang still saw the plaintiff on March 16, 2020 to assess his pain. But he told the plaintiff that because of the new restrictions, he could only extract the offending tooth and could not perform a filling. The plaintiff told Yang that he was in pain but not enough to warrant an extraction of his tooth. Yang explained that fillings would not be performed for the foreseeable future, but the plaintiff still refused the alternate treatment, telling Yang he would wait his turn for a filling.

Over the next several months, the plaintiff continued to submit DSRs about his tooth being painful, but he continued to refuse to undergo an extraction to alleviate the pain. It is undisputed that dental staff could not perform fillings until September 2020, and Dr. Yang could not bypass the COVID-19 restrictions and specially provide the plaintiff a filling. As soon as it was safer to perform fillings again, Yang saw the plaintiff based on his position on the waitlist among other incarcerated persons who also had been waiting for fillings or other non-urgent treatment. The plaintiff received the filling in February 2021.

There is no evidence that Dr. Yang intentionally delayed the plaintiff's filling for reasons other than prison restrictions at the time. The evidence instead shows that Yang reasonably delayed the plaintiff's care—as he did all incarcerated persons' non-emergency dental care—because of COVID-19. The plaintiff claims that Yang should have made an exception because his pain was severe, but the undisputed evidence shows that Yang was prohibited from doing so. The plaintiff's consistent refusals to have his tooth extracted also suggested his pain was not severe or urgent. As the court has explained, delays in treatment caused by "prison bureaucracy" do not constitute deliberate indifference. Dent, 751 F. App'x at 919. The plaintiff claims that Yang delayed his care for non-policy reasons, but he has presented no evidence and has no personal knowledge to support that assertion. The plaintiff's "unsupported conclusory assertions" about Yang's treatment motives or reasoning "amount[] to speculation rather than competent evidence sufficient to raise a factual dispute." Cambronero, 2023 WL 4946724, at *2 (citing Fed. R. Civ. P. 56(c)(4); Pulera v. Sarzant, 966 F.3d 540, 550–51 (7th Cir. 2020)). The undisputed evidence would not allow a reasonable jury to find that Yang unreasonably or inappropriately delayed the plaintiff's filling or disregarded his pain. Dr. Yang is entitled to judgment as a matter of law.[6]

---

[6] Because the court concludes that the defendants are entitled to summary judgment on the plaintiff's federal claims, the court will not exercise supplemental jurisdiction over his state-law negligence claim against Dr. Yang. See 28 U.S.C. §1367(c)(3). The plaintiff may bring that claim in state court, subject to the statute of limitations.

### 5. *Nursing Coordinator Doehling*

The plaintiff has not explained his claim against Doehling and has presented no evidence showing that Doehling was personally involved in his dental care between June 2018 and March 2020. It is undisputed that she did not receive or review his complaints, provide him treatment or even know about his dental care or needs. There is no evidence that Doehling had any involvement in the plaintiff's dental care whatsoever.

Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." Hildebrant v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)). The undisputed evidence shows that defendant Doehling did not cause or participate in the plaintiff's allegedly delayed and inadequate dental care. No reasonable jury could conclude that Doehling is liable to the plaintiff. She is entitled to judgment as a matter of law.

### 6. *Health Services Manager Ludwig*

The plaintiff claims that Ludwig ignored his complaints and requests for immediate dental care. Ludwig was the Health Services Manager at Kettle Moraine from September 2019 until December 2021. Her responsibilities included supervising health services staff and other administrative duties. She is not a dentist, was not responsible for the plaintiff's treatment or care and did not perform any of the plaintiff's dental procedures or checkups. Her only involvement in the plaintiff's claims came when an institutional complaint

examiner contacted her in response to the plaintiff's complaints about his care. The evidence shows that Ludwig deferred to the dentists' treatment plans and reported what she learned from the plaintiff's medical records back to the complaint examiner. She similarly responded to the plaintiff's September 12, 2019 letter by explaining that his concerns had been addressed through the institutional complaint process.

Chief administrators, like the Health Services Manager, "are ordinarily not personally liable for decisions made by subordinates, even if they receive a letter complaining about those decisions and do not intervene." Courtney v. Devore, 595 F. App'x 618, 620 (7th Cir. 2014) (citing Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009)). The evidence shows that this was Ludwig's only involvement. She reviewed the plaintiff's letter and complaints about his concerns and responded accordingly. There is no evidence that she caused or participated in the plaintiff's care or that she was involved in the delays of which he complained. She was not even at Kettle Moraine when the plaintiff received much of his treatment. Because Ludwig was not personally involved in the plaintiff's dental care, no reasonable jury could find her liable on his Eighth Amendment claims. She is entitled to judgment as a matter of law.

III.    **Plaintiff's Response to the Defendants' Reply Brief (Dkt. No. 128)**

On August 4, 2023, the court received from the plaintiff a document titled "Plaintiff's Reply Dkt. #127." Dkt. No. 128. This document reiterates the plaintiff's assertions from his response brief regarding his claims against

defendants Kinziger and Panos and asserts that those defendants are not entitled to qualified immunity. Id. at 1–2.

This document is a sur-reply to the defendants' reply brief, Dkt. No. 127. Neither the Federal Rules of Civil Procedure nor this court's Civil Local Rules contemplate sur-replies, and the plaintiff did not seek permission from the court to file it. "'The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief.'" Watt v. Brown County, 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016) (quoting Meraz-Camacho v. United States, 417 F. App'x 558, 559 (7th Cir. 2011)). The defendants did not raise new arguments in their reply brief; they responded to the plaintiff's opposition brief and asserted that he failed to propose additional facts warranting denial of their motion for summary judgment. The plaintiff's sur-reply disagrees with that position, but it does not assert that the defendants raised new arguments. The court has not considered the plaintiff's sur-reply in reaching its decision to grant the defendants' motion for summary judgment.

## IV. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 97.

The court **ORDERS** that this case is dismissed. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by

filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of October, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**